23 F.3d 685
 Michael D. O'NEILL, Plaintiff-Appellant,
v.
CITY OF AUBURN; Guy Cosentino, Mayor of the City of Auburn;
James E. Malone, City Manager for the City of Auburn;
James Hutchinson, Ann Bunker, Councilors of the Auburn City
Council; Andrew V. LaLonde, as Corporation Counsel for the
City of Auburn and Other Unknown and Unnamed Participants In
The Complained of Acts, Defendants-Appellees.
 No. 1108, Docket 93-7909.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 28, 1994.
Decided May 3, 1994.
 
 Edward C. Hooks, Ithaca, NY (Laurie M. Johnston, Harris, Beach & Wilcox, Ithaca, NY, on the brief), for plaintiff-appellant.
 Nicholas J. D'Ambrosio, Jr., Albany, NY (Michael J. Grygiel, Bond, Schoeneck & King, Albany, NY, on the brief), for defendants-appellees.
 Before: KEARSE and LEVAL, Circuit Judges, and POLLACK, Senior District Judge.*
 LEVAL, Circuit Judge:
 
 
 1
 This is an appeal from a grant of summary judgment dismissing an action brought under 42 U.S.C. Sec. 1983 by a terminated public official of Auburn, New York, alleging that his termination deprived him of property and liberty without due process of law. We affirm.
 
 
 2
 In September 1992, plaintiff-appellant Michael D. O'Neill was dismissed by the City of Auburn, New York, after nearly 15 years as City Engineer-Superintendent of Public Works. In recent years, O'Neill's service in that position had been marked by criticism in the press for alleged conflicts of interest, sometimes stemming from his private business interests; this criticism had included demands for his resignation. O'Neill also had been the subject of a grand jury investigation in 1988-89 and a City Ethics Board inquiry in 1990-91. The Auburn City Ethics Board had issued a report after investigation that O'Neill had violated the City Ethics Code (by receipt of a gift "under circumstances in which it could reasonably be inferred that the gift was intended to influence him ... in the performance of his official duties...."), and a grand jury had issued a report that O'Neill "may have created an appearance of impropriety."
 
 
 3
 Following his termination, O'Neill brought suit under 42 U.S.C. Sec. 1983, claiming that defendants, The City of Auburn, the City Manager, and other city officials, deprived him of property and liberty interests without due process of law as guaranteed by the Fourteenth Amendment. First, O'Neill claims that Section 75 of New York State Civil Service Law gives him a property interest in his job, entitling him to notice and a hearing before termination; he received no notice or hearing. Second, he claims the defendants made stigmatizing public statements at the time he was terminated; he contends these statements infringed his constitutionally-protected liberty interest in securing future employment and entitle him to a hearing to clear his reputation.
 
 
 4
 The district court granted defendants' motion for summary judgment as to both claims.
 
 
 5
 I. Deprivation of property without due process
 
 A. Property interest created by Sec. 75
 
 6
 O'Neill claims deprivation of his property without due process because he was discharged from his position without notice and a hearing. When a governmental employee is found to have a "property interest" in continuation of his or her employment, the Due Process Clause of the Fourteenth Amendment forbids discharge unless the employee is afforded a pre-termination hearing. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); Board of Regents v. Roth, 408 U.S. 564, 576-77, 92 S.Ct. 2701, 2708-09, 33 L.Ed.2d 548 (1972); Dwyer v. Regan, 777 F.2d 825, 831 (2d Cir.1985), modified, 793 F.2d 457 (2d Cir.1986). Property interests in employment "are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law....' " Loudermill, 470 U.S. at 538, 105 S.Ct. at 1491 (quoting Roth, 408 U.S. at 577, 92 S.Ct. at 2709).
 
 
 7
 O'Neill identifies New York State Civil Service Law Sec. 75(1)(c) as the source of his property interest in his job. This statute states in relevant part:
 
 
 8
 A person ... shall not be removed or otherwise subjected to any disciplinary penalty provided in this section except for incompetency or misconduct shown after a hearing upon stated charges pursuant to this section [if that person is] an employee holding a position in the non-competitive class other than a position designated in the rules of the state or municipal civil service commission as confidential or requiring the performance of functions influencing policy, who ... has completed at least five years of continuous service....
 
 
 9
 N.Y.Civ.Serv.Law Sec. 75(1)(c) (McKinney Supp.1993).
 
 
 10
 O'Neill claims that his position is a non-competitive civil service title that was never classified as "confidential" or "policy-making" by the Auburn Civil Service Commission. It is undisputed that he held his position for "at least five years of continuous service." He therefore contends that Sec. 75(1)(c) gives him a property interest in retaining his job unless termination is preceded by notice and hearing.[1] He asserts that his termination was not preceded by notice of charges of incompetency or misconduct and a hearing thereon, and that his right to due process before deprivation of his property was therefore violated.
 
 
 11
 We have previously held that Sec. 75 gives covered employees a property interest in their employment, so that they may not be terminated without notice and hearing. Dwyer v. Regan, 777 F.2d 825 (2d Cir.1985), modified, 793 F.2d 457 (2d Cir.1986); Berns v. Civil Service Comm'n, 537 F.2d 714, 716 (2d Cir.1976), cert. denied, 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977). Nonetheless, we reject O'Neill's claim because we find that the Auburn City Engineer-Superintendent of Public Works is an "independent officer" and is not covered by Sec. 75.
 
 B. Independent officer exception
 
 12
 While Sec. 75(1)(c) expressly protects all civil service employees other than those in confidential or policy-making positions, defendants contend, and we agree, that the judicially-created independent officer exception exempts other positions from the protection of this statute.
 
 1. Definition of the exception
 
 13
 The independent officer exception to Sec. 75(1)(c) originated in judicial interpretations of Sec. 22 of the Civil Service Law (now Sec. 75(1)(b)), a longstanding parallel provision, which gives military veterans and volunteer firefighters who hold civil service positions the right to notice and a hearing before discharge. This section on its face excludes from its protection only those persons employed as "private secretary, cashier or deputy of any official or department." Sec. 75(1)(b). However, in cases such as Mylod v. Graves, 274 N.Y. 381, 384, 9 N.E.2d 18 (1937) and O'Day v. Yeager, 308 N.Y. 580, 127 N.E.2d 585 (1955), the New York Court of Appeals has held that this section protects only subordinate employees, not those whose high level of responsibility qualifies them as independent officers. Id. at 585, 127 N.E.2d 585 ("The protection.... 'was intended to apply only to those holding positions of a subordinate nature,' and, consequently, to the list of persons specifically excluded from the protective coverage of the statute must be added those who are officials filling independent positions.") (quoting Mylod, 274 N.Y. at 384, 9 N.E.2d 18).
 
 
 14
 O'Neill grounds his assertion of a property interest in the more broadly applicable Sec. 75(1)(c). He claims that the independent officer exception does not apply to Sec. 75(1)(c) because this section sets forth an explicit exclusion that applies only to employees "designated ... as confidential or requiring the performance of functions influencing policy." Id. The record supports O'Neill's contention that his position never received a designation as "confidential" or "policy-making." However, his argument that there is no independent officer exception to Sec. 75(1)(c) has already been rejected by New York courts. We reject it as well.
 
 
 15
 In Nolan v. Tully, 52 A.D.2d 295, 383 N.Y.S.2d 655, 656 (3d Dep't 1976), the Appellate Division held that the "independent officer" exception, which the courts had read into Sec. 75(1)(b), applies equally to the protection against discharge given by Sec. 75(1)(c). The court considered, but rejected, the possibility that the listing of confidential and policy-making positions in Sec. 75(1)(c) precluded application of the independent officer exception. The court noted that when the Legislature added Sec. 75(1)(c) in 1965, it was aware that the courts had created the independent officer exception to Sec. 75(1)(b); "Nevertheless, there is a total absence of any language in the 1965 amendment to section 75 that could denude, or affect in any way this judicially created exception." Nolan, 383 N.Y.S.2d at 657, 383 N.Y.S.2d 655. The court thus declined to rule that Sec. 75(1)(c) granted tenured civil servants who came within the definition of independent officer any greater protection than that given veterans and volunteer firefighters by Sec. 75(1)(b). It held attorneys employed by New York's department of taxation were independent officers and thus unprotected. The New York State Supreme Court for Erie County followed the authority of Nolan in Gallagher v. Griffin, 93 Misc.2d 174, 402 N.Y.S.2d 516, 518 (Sup.Ct.Erie Co.1978), holding the city's director for youth to be an "independent officer" and thus excluded from the protection of Sec. 75(1)(c).
 
 
 16
 The Nolan and Gallagher decisions do not necessarily bind us, because while those holdings are grounded in the authority of the state's highest court, the Court of Appeals has not ruled on the precise issue whether the independent officer exception to Sec. 75(1)(b) applies as well to Sec. 75(1)(c). Our task is to predict how the state's highest court would rule on this issue. In re Brooklyn Navy Yard Asbestos Litig. (Joint E. & S. Dist. Asbestos Litig.), 971 F.2d 831, 850 (2d Cir.1992) ("A federal court faced with a question of unsettled state law must do its best to guess how the state court of last resort would decide the issue."); cf. Plummer v. Lederle Lab., Div. of Am. Cyanamid Co., 819 F.2d 349, 355 (2d Cir.) (holding, in diversity action, that where state's highest court has not ruled on issue, federal court "should determine what it believes that state's highest court would find if the issue were before it"), cert. denied, 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987); De Weerth v. Baldinger, 836 F.2d 103, 108 (2d Cir.1987), cert. denied, 486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988).
 
 
 17
 We adopt the Third Department's ruling in Nolan as a reliable indicator of how the Court of Appeals would rule on the applicability of the independent officer exception to Sec. 75(1)(c). See Brooklyn Navy Yard, 971 F.2d at 850 (noting that "[w]here the high court has not spoken, the best indicators of how it would decide are often the decisions of lower state courts"). The exemption of independent officers from civil service protection was long ago endorsed by the Court of Appeals. O'Day v. Yeager, 308 N.Y. 580, 127 N.E.2d 585 (1955); Mylod v. Graves, 274 N.Y. 381, 9 N.E.2d 18 (1937). O'Neill has not presented any authority to suggest that the independent officer exception has been repudiated or undermined. Furthermore, we find the reasoning of the Third Department in Nolan to be persuasive.
 
 
 18
 Accordingly, we find that Civil Service Law Sec. 75(1)(c) does not confer a property right in continued employment upon state civil servants who are "independent officers" as that term is defined by New York case law. Cf. Baden v. Koch, 638 F.2d 486, 492 n. 11 (2d Cir.1980) (speculating that independent officer exception might apply to New York City's Chief Medical Examiner, who was found for other reasons not to be within the notice and hearing protection of Sec. 75).
 
 2. Application to appellant
 
 19
 We find for the reasons that follow that appellant O'Neill is an "independent officer."
 
 
 20
 The New York State Court of Appeals in 1955 defined "independent officer" as follows: "[H]e is an independent officer whose position is created, and whose powers and duties are prescribed, by statute and who exercises a high degree of initiative and independent judgment." O'Day v. Yeager, 308 N.Y. 580, 586, 127 N.E.2d 585 (1955). O'Neill's position as City Engineer-Superintendent of Public Works is created by statute (Local Law 7 1963). The post's numerous statutory duties include giving permits for all street excavations, Auburn Munic.Code Sec. 44.23, supervising restoration of streets, id. Sec. 44.26, and directing the placement of underground wires and cables, id. Sec. 44.37. The position grants considerable decisional authority over the water and sewer system, including the power to hold hearings to determine suspension of water service, id. at Sec. 45.51(C), and to determine violations of sewage treatment requirements and assess penalties. Id. Secs. 46.87-46.89. These duties require the exercise of a high degree of initiative and independent judgment. The fact that the City Engineer-Superintendent of Public Works receives direction from the City Manager does not preclude finding that he is an "independent officer." In O'Day v. Yeager, the Court of Appeals found that the clerk of the surrogate's court was an independent officer, even though his powers were exercised subject to the approval and direction of the surrogate. 308 N.Y. at 586, 127 N.E.2d 585.
 
 
 21
 In our opinion, the district court correctly determined that the City Engineer-Superintendent of Public Works is an independent officer who, under applicable state law, is excluded from the protection of Civil Service Law Sec. 75(1)(c). O'Neill thus had no property interest in retaining this position, and defendants did not violate his right to due process of law by terminating him from the position without notice and a hearing. Defendants were properly granted summary judgment on O'Neill's first cause of action, and we affirm.
 
 
 22
 II. Deprivation of liberty without due process
 
 
 23
 Petitioner's second claim is that defendants stigmatized him by publicizing allegations impugning his professional competence and his ethics; he asserts entitlement under the Fourteenth Amendment to a name-clearing hearing.
 
 
 24
 Our courts have established that the "liberty" interest protected by the due process clause includes in certain circumstances the right to contest at a hearing public, stigmatizing governmental accusations that impose a substantial disability. Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971) (holding that state law authorizing designated persons to prohibit alcohol sales to alleged problem drinkers by publicly posting their names violated due process clause because no notice or hearing was provided before posting). Because dismissal from employment for stigmatizing reasons can imperil the opportunity to earn one's living in one's profession, the liberty interest cause of action has most pointedly focussed on stigmatizing statements in the context of dismissal. See Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) (establishing that liberty interest creates right to name-clearing hearing when government makes stigmatizing charges in connection with decision not to rehire employee, though finding that simple dismissal from non-tenured, one-year appointment not "stigmatizing," so no hearing required); Brandt v. Board of Coop. Educ. Servs., 820 F.2d 41, 43 (2d Cir.1987) (liberty interest implicated when public governmental charges accompanying dismissal impose stigma that impairs opportunity to obtain other employment); Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 446 (2d Cir.1980) ("It is well-settled that an individual's liberty can be implicated when a governmentally imposed stigma restricts his ability to seek and obtain employment.").[2]
 
 
 25
 The complaint asserts that at the time O'Neill was discharged from his position, local newspapers wrote that anonymous sources in city government told them that O'Neill was "incompetent," could "no longer do the job," had "poor relationships" with state agencies, did work that was not "up to par," and was "slopp[y]." The complaint attributes these statements to the defendants and alleges that they were false. In an affidavit filed in answer to defendants' motion for judgment on the pleadings, O'Neill added reference to press reports of similar assertions that "ethical considerations" led to his dismissal. The district court apparently treated this affidavit as an amendment of the complaint, broadening O'Neill's allegations to include the statements about "ethical considerations." The district court granted summary judgment in favor of the defendants on these claims. It held, first, that statements about competence are not "stigmatizing" and do not give rise to a cause of action for a name-clearing hearing. As to the alleged statement that O'Neill's dismissal was related to ethical considerations, the defendants had made a showing on the motion for summary judgment that this was true--and O'Neill had failed to allege otherwise.
 
 
 26
 We affirm.
 
 A. Allegations impugning competence
 
 27
 Not every derogatory statement made about an employee who loses his or her job imposes sufficient stigma to implicate the liberty interest and require a name-clearing hearing. Cf. Roth, 408 U.S. at 575, 92 S.Ct. at 2708 ("[i]t stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another"). In Russell v. Hodges, 470 F.2d 212 (2d Cir.1972), we held that a provisional narcotics correction officer, discharged for sleeping on duty, being absent from his post without authorization, and wearing improper attire, had no right to a name-clearing hearing. Judge Friendly explained that stigmatization giving rise to a cause of action required "something considerably graver than a charge of failure to perform a particular job, lying within the employee's power to correct." Id. at 217 (emphasis added).
 
 
 28
 The district court granted summary judgment based on its understanding that allegations of incompetence are, as a matter of law, insufficiently stigmatizing to give rise to a cause of action. Although the district court may have read our precedents overbroadly, we nonetheless agree that, in this instance, the allegations going to O'Neill's competence did not implicate the liberty interest.
 
 
 29
 The last three statements reported by the newspapers about O'Neill--that he had "poor relationships" with state agencies, that his work was not "up to par," and was "slopp[y]"--fall clearly within the category of statements described in Russell that are not stigmatizing because they describe problems within the employee's power to correct.
 
 
 30
 As to the statements that O'Neill was fired for "incompetence" and that he could "no longer do the job," the question is somewhat closer. An accusation that a licensed professional is incompetent is "considerably graver" and carries more potential for future disqualification from employment than a statement that the individual performed a job poorly. An employee's unwillingness to perform professional duties properly in a particular position could result from innumerable factors that would not be replicated in a subsequent employment setting. A prospective subsequent employer, especially for a position requiring professional skills, is far more likely to hire one who has chosen to perform below par in a particular prior engagement than one who was incapable of doing the job.
 
 
 31
 We have held that governmental allegations of professional incompetence made in connection with an employee's termination may, if they significantly restrict future employment opportunities, sufficiently impair the liberty interest that a name-clearing hearing should be afforded. In Huntley v. Community School Board, 543 F.2d 979 (2d Cir.1976), cert. denied, 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 773 (1977), we held that public charges against a school principal that went "to the very heart of [his] professional competence," id. at 985, and that "might damage his professional reputation," id. at 986, "surely stigmatized [him] within the meaning of Board of Regents v. Roth." Id. at 985. See also Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 446 n. 4 (2d Cir.1980) (noting in dicta that "stigmatizing information is not limited to charges of illegality, dishonesty or immorality").
 
 
 32
 This does not mean that every time a professional employee is dismissed amid public charges of incompetence, a name-clearing hearing is required. In Baden v. Koch, 799 F.2d 825 (2d Cir.1986), we denied a claim by New York City's former Chief Medical Examiner that his demotion to the position of Deputy Medical Examiner amidst critical public charges entitled him to a name-clearing hearing. We noted that even after demotion Baden held a supervisory position and that "there is nothing in the record to show that Baden as an M.D. cannot obtain government or non-government employment using his skills in forensic medicine.... [H]e can still practice his profession." Id. at 830-31.[3] We contrasted Baden's situation with that of the school principal in Huntley, whose public castigation by school officials as a thoroughly incompetent principal made it "unlikely that [he] would ever have a chance to obtain another supervisory position--in the public schools or elsewhere." Huntley, 543 F.2d at 985, cited in Baden, 799 F.2d at 830.
 
 
 33
 Taken together, our cases suggest that governmental allegations of professional incompetence, made in connection with an employee's termination, will not support a cause of action for a name-clearing hearing unless the allegations go "to the very heart of [the employee's] professional competence," Huntley, 543 F.2d at 985, and threaten to "damage his professional reputation," id. at 986, significantly impeding his ability to "practice his profession." Baden, 799 F.2d at 831.
 
 
 34
 We cannot find that the statements impugning O'Neill's "competence" stigmatized him in this manner. O'Neill's position as City Engineer/Superintendent of Public Works was multi-faceted. It included not only duties he performed as a licensed professional civil engineer, but also numerous administrative and supervisory functions, as well as functions involving relations with other agencies of government. The statements published in the newspapers were vague and did not specify which aspects of his job he was "incompetent" to perform; they could have meant no more than that he lacked supervisory skills, had an abrasive managerial style, or caused unnecessary friction in dealing with other public agencies. Thus we cannot find that these statements impugned his professional reputation as a licensed engineer or impaired his ability to find future employment within his profession. Without passing here on whether or in what circumstances publicized statements of government officials to the effect, "O'Neill is an incompetent engineer," might have implicated his liberty interests, we can safely conclude that the vague statements of unspecified "incompetence" did not damage O'Neill's professional reputation in a manner that required a hearing. Accordingly, we find that the district court was correct in granting summary judgment as to these statements.
 
 
 35
 B. Allegations about "ethical concerns"
 
 
 36
 The district court also granted the defendants' motion for summary judgment on the other portion of O'Neill's liberty interest claim, in which O'Neill contended that his liberty interest was violated by statements by unnamed government officials that "ethical considerations" played a part in his termination. The court found that, while statements impugning ethics were stigmatizing under Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) and Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438 (2d Cir.1980), summary judgment was appropriate because O'Neill had failed to allege that these statements were untrue.
 
 
 37
 As noted above, the complaint initially referred only to the statements alleging incompetence. Defendants then moved for judgment on the pleadings, arguing on the theory that because statements about incompetence are not stigmatizing, O'Neill stated no liberty interest claim. O'Neill responded by an affidavit (which all apparently treated as an amendment of the complaint) in which he asserted that the defendants also made statements to the effect that "ethical considerations" contributed to his firing.
 
 
 38
 The defendants then moved for summary judgment, pointing out that O'Neill had failed to allege the falsity of the complained-of statement about ethical considerations and that furthermore, the statement, if made, was undeniably true, as (i) the Auburn City Ethics Board had issued a report after investigation that O'Neill had violated the City Ethics Code (by receipt of a gift "under circumstances in which it could reasonably be inferred that the gift was intended to influence him ... in the performance of his official duties...."), and (ii) a grand jury had issued a report that O'Neill "may have created an appearance of impropriety." O'Neill made no response.
 
 
 39
 The court ruled that this required grant of the defendants' motion for summary judgment. We agree with that ruling.
 
 
 40
 A plaintiff who demands a name-clearing hearing must contest the truth of the allegedly stigmatizing statements because, as the Supreme Court has explained, the purpose of a name clearing hearing is to give the allegedly stigmatized employee an opportunity to refute the government's stigmatizing charges. If the truth of the statements is not contested, there is nothing to have a hearing about. Codd v. Velger, 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977) ("[I]f the hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute between an employer and a discharged employee which has some significant bearing on the employee's reputation.").
 
 
 41
 In addition to plaintiff's failure to plead (or otherwise allege) the falsity of the proposition that ethical considerations played a role in his dismissal, he also failed to submit any evidence showing the existence of a triable issue of fact in response to the defendants' showing, on their summary judgment motion, that this proposition was true. The court therefore asserted, "Nor does it appear that plaintiff could allege that these statements are false," (Op. at 35 n. 10), citing the defendants' evidence of the grand jury and Ethics Board reports. Although a plaintiff is not required in such an action to prove the falsity of the stigmatizing statements, that being the function of the eventual name-clearing hearing, Brandt v. Board of Coop. Educ. Servs., 820 F.2d 41, 43-44 (2d Cir.1987), if the defendants have shown on their motion for summary judgment that the stigmatizing statements are true, the plaintiff must at least show that there is a factual dispute. See Fed.R.Civ.P. 56(e). O'Neill's failure to rebut defendants' showing that ethical considerations played a part in his dismissal therefore provides additional reason, beyond his failure to plead falsity, for the dismissal of this portion of his action.[4]
 
 Conclusion
 
 42
 The district court's grant of summary judgment, dismissing O'Neill's claims that the City of Auburn deprived him of property and liberty interests in connection with his termination from employment as City Engineer/Superintendent of Public Works, is affirmed.
 
 
 
 *
 The Honorable Milton Pollack, United States Senior District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 O'Neill also claims that he had an "understanding" with the City of Auburn that independently created a property interest in the job. This argument, made apparently for the first time on appeal, is untimely, and in any event, appears to lack merit
 
 
 [2]
 While Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), suggested that the liberty interest might be implicated whenever the government imposed stigma, it is by now clear that simple damage to reputation does not give rise to a liberty interest claim; rather, the damage must be accompanied by some significant deprivation, such as dismissal from government employment. See Paul v. Davis, 424 U.S. 693, 708-712, 96 S.Ct. 1155, 1164-1166, 47 L.Ed.2d 405 (1976) (reading Constantineau to mean that liberty is infringed only when stigma is accompanied by deprivation of an interest protected by state or federal law, or by an alteration of legal status); Martz v. Incorporated Village of Valley Stream, 22 F.3d 26, 31-32 (2d Cir.1994) ("Defamation alone, even by a government entity, does not constitute a deprivation of a liberty interest protected by the Due Process Clause.")
 
 
 [3]
 While we found that Baden had alleged a "weak" liberty interest, 799 F.2d at 831, we held that he was not entitled to a name-clearing hearing, in part because he had already been given the opportunity to publicly contest the accuracy of the allegedly stigmatizing allegations
 
 
 [4]
 Although not briefed by the parties, this case raises the additional question whether the action is mooted by the availability to the plaintiff of a libel action in the courts of New York. If, by offering such an action, the State of New York has provided O'Neill with the very remedy he seeks--a "name clearing hearing" consonant with the requirements of due process--then there is no need for an action under 42 U.S.C. Sec. 1983. In this respect, this case seems distinguishable from those precedents where the stigmatizing statements were made as part of the governmental agency's official act of terminating the employee. In such cases, the officials making the stigmatizing statements would be immune from suit. See, e.g., Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) (establishing absolute immunity from defamation suits for federal officials acting within scope of duty); Sheridan v. Crisona, 14 N.Y.2d 108, 249 N.Y.S.2d 161, 198 N.E.2d 359 (1964) (holding state law extends absolute immunity from defamation suits to state and local executive officials acting within scope of duty). The official immunity of the defendants would thus deprive the stigmatized employee of an opportunity to clear his name by suing for libel, giving rise to his need for an action under 42 U.S.C. Sec. 1983. Here, on the other hand, where it is alleged that officials of city government anonymously provided unofficial statements to reporters that were then disseminated, such statements might not be a part of the performance of official duties, and the officials might therefore be subject to suit. Cf. Hutchinson v. Proxmire, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) (holding that although Speech and Debate Clause, U.S. Const. art. 1, Sec. 6, gave senator immunity from libel suit for speech on Senate floor, immunity did not extend to repetition of speech in press releases and newsletters). State law might thus offer plaintiff the remedy he seeks. (Where a libel plaintiff seeks no damages, but only a name-clearing declaratory judgment, I have argued that the obligation imposed by New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), to prove "malice" does not arise, as Sullivan imposes that prerequisite only on the award of money damages to protect the press from intimidation. Pierre N. Leval, The No Money No Fault Libel Suit: Keeping Sullivan in Its Proper Place, 101 Harv.L.Rev. 1287 (1988))
 Judges KEARSE and POLLACK express no views either in agreement or disagreement with the discussion in this footnote.